UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| SOCIALEDGE, INC. d/b/a CREATORIQ, | : | |
| | : | |
| Plaintiff, | : | **AMENDED COMPLAINT** |
| | : | |
| - against - | : | Index No. 23 Civ. 6860 (PAE) |
| | : | |
| TRAACKR, INC. and BEN STAVELEY, | : | |
| | : | |
| Defendants. | : | |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff Socialedge, Inc. d/b/a CreatorIQ ("CreatorIQ"), by and through its attorneys, Slarskey LLC, alleges as follows for its Complaint against Traackr, Inc. ("Traackr") and Ben Staveley ("Staveley") (together, "Defendants").

## INTRODUCTION

1.      Staveley, a former CreatorIQ employee, stole trade secrets—including, upon information and belief, product intelligence, product demonstrations, customer lists, price lists, and pricing methodologies—from CreatorIQ in order to bring them to Traackr, a direct competitor in the influencer marketing industry. Staveley and Traackr have unfairly used these trade secrets for Traackr's direct benefit and to CreatorIQ's direct detriment. Staveley's actions not only violate the terms of a confidentiality agreement Staveley agreed to while employed by CreatorIQ, but Defendants' use of the trade secrets violate a multitude of trade secrets, computer fraud, and unfair competition laws.

2.      Prior to his employment at Traackr, Staveley was a global sales & marketing manager for CreatorIQ, with the title, Senior Vice President, Growth. In this role at CreatorIQ, Staveley managed a large number of employees, attended board meetings, and had

access to all sales & marketing systems containing trade secrets and other highly proprietary and competitively sensitive information. CreatorIQ has been provided and uncovered evidence indicating that, following Staveley's departure from CreatorIQ, he corruptly reviewed and retained CreatorIQ's confidential and proprietary information and disclosed this information to Traackr. Staveley and Traackr then used that confidential and proprietary information to gain an unfair competitive advantage and specifically target a new customer.

3. This evidence includes a *direct admission* by a current Traackr employee that Staveley "stole" CreatorIQ's confidential and proprietary information—including an entire product demonstration, customer lists, and customer contacts—which he then used in his employment at Traackr to gain an unfair competitive advantage over his prior employer. Specifically, Staveley showed a confidential product demonstration to numerous Traackr employees at a "town hall" style meeting. Despite lamenting Traackr's decision to hire an individual—*i.e.*, Staveley—with "no morals," the Traackr employee also acknowledged that Traackr then used CreatorIQ's confidential and proprietary information to obtain intelligence about CreatorIQ's customer relationships and to target CreatorIQ customers.

4. Making matters worse, CreatorIQ has also learned from its own investigation that just prior to leaving CreatorIQ, Staveley accessed a CreatorIQ-owned customer relationship management account to export hundreds of thousands of records of CreatorIQ's contacts and companies, and created an unauthorized login ID which he has repeatedly used to access other CreatorIQ-owned customer relationship management accounts while working for Traackr, including *during* the pendency of this litigation.

5. In the hands of a direct competitor like Traackr, the trade secret information Staveley misappropriated could be, and in this case already has been, employed to

boost Traackr's business and share of the market and have adverse consequences on CreatorIQ's sales, current customer relationships, and ongoing business strategies.

6.     Before CreatorIQ's customer relationships, confidential and proprietary information, and goodwill are further eroded, CreatorIQ brings this action for injunctive relief and monetary damages arising out of Defendants' trade secret misappropriation and other willful misconduct.

## PARTIES

7.     CreatorIQ is a corporation organized under the laws of the State of Delaware, a foreign business corporation registered to do business in New York, and maintains its principal place of business in Los Angeles, California. CreatorIQ also maintains offices throughout the world, including in, among other cities, New York City, Chicago, and London.

8.     Traackr is a corporation organized under the laws of the State of Delaware, a foreign business corporation registered to do business in New York, and maintains its principal place of business in San Francisco, California. Traackr also maintains offices throughout the world, including in, among other cities, Manhattan, Buenos Aires, London, and Paris.

9.     Staveley is a natural person currently employed as Vice President of Global Revenue Operations at Traackr, works in Traackr's Manhattan office, and—upon information and belief—resides in New York, New York.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), as Defendants, through their actions described below, have misappropriated CreatorIQ's trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836,

improperly accessed CreatorIQ's computers in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and under 28 U.S.C. § 1367 for related state law claims.

11.     This Court has personal jurisdiction over all Defendants because they reside within the State, transact business within the State, and/or have committed tortious acts within the State.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Traackr maintains an office in Manhattan, Staveley works in Traackr's Manhattan office and—upon information and belief—resides in New York, New York, and a substantial part of the events or omissions giving rise to CreatorIQ's claims occurred in this district.

## FACTUAL ALLEGATIONS

### A.     General Background

13.     With the advent of social media, influencers and creators—*i.e.*, individuals who have a dedicated social following and are often viewed as experts within their niche—have risen as a recognized and powerful marketing channel, as recommendations from influencers serve as a form of "social proof" to a brand's potential customers.

14.     Influencer marketing enables businesses to collaborate with influencers and creators to increase brand exposure. Companies may ask a person with a large social media following to publish content on his/her various social platforms to promote their products or services.

15.     CreatorIQ is a technology company that specializes in influencer marketing and social media management. It provides a comprehensive platform for brands and agencies to locate and manage influencer marketing campaigns and track performance across various social media channels. CreatorIQ's platform offers tools for identifying and connecting with relevant influencers, facilitating collaboration and content creation, as well as measuring the

impact and effectiveness of influencer campaigns. CreatorIQ's focus lies in streamlining the influencer marketing process, enabling customers to discover the most suitable influencers for their brand, monitor campaign progress in real-time, and analyze the reach and engagement of their sponsored content. By leveraging advanced analytics and AI-driven insights, CreatorIQ enables brands and agencies to build authentic and successful influencer partnerships.

16.     According to its LinkedIn page, Traackr "is the system of record for data-driven influencer marketing, providing the intelligence and tools needed to run impactful influencer marketing programs." Its "platform enables marketers to invest in the right strategies, streamline campaigns, and scale global programs."

**B.     Staveley's Role at CreatorIQ and His Access to CreatorIQ's Trade Secrets**

17.     In approximately January 2020, Staveley was hired by Tribe Dynamics International Ltd. ("Tribe UK"), the UK-subsidiary of Trib3.com, Inc ("Tribe US"). Tribe UK, Tribe US, and their other group entities were collectively doing business as Tribe Dynamics.

18.     Tribe Dynamics was a marketing company that offered advanced influencer marketing analytics and solutions for lifestyle brands.

19.     In approximately September 2021, Staveley moved to the United States and accepted a position as Vice President, Growth with Tribe US.

20.     CreatorIQ acquired Tribe Dynamics in approximately November 2021. As part of the acquisition, Tribe US modified its name and legal form to Tribe Dynamics LLC.

21.     On October 1, 2022, all Tribe Dynamics LLC employees, including Staveley, became employees of CreatorIQ.

22.     Staveley subsequently became Senior Vice President, Growth, and in that role, had access to CreatorIQ's highly confidential and proprietary product demonstrations, customer relationship management database ("CRM") (which includes customer names and

contacts), and customer-specific pricing information and product strategies. If that information were shared with a competitor, like Traackr, the information would be extremely competitively valuable.

23.     In particular, the customers with whom CreatorIQ has relationships, and information concerning those customer relationships, pricing, and CreatorIQ product strategies have substantial economic value in the hands of a competitor because: (1) CreatorIQ develops *unique* product demonstrations, pricing information, and product strategies for current and prospective customers; and (2) CreatorIQ uses customer-specific pricing information as part of its bids in response to RFPs from customers.

24.     CreatorIQ's product demonstrations offer prospective customers access to CreatorIQ's software user interface and user experience, provide step-by-step instructions on the functionality of CreatorIQ's user interface and how it should best be used to maximize its effectiveness, and are specifically tailored to fit the prospective customer's anticipated or expressed needs.

25.     CreatorIQ's CRM database contains a list of CreatorIQ's 800+ customers, contract sizes, contract end dates, and customer contacts, including the names, contact information, current employers, and sales notes concerning more than 30,000 individuals across a multitude of commercial industries from around the world. This CRM database contains information regarding specialized executives and their numerous roles within their specified industries, and CreatorIQ has expended hundreds of hours and substantial sums of money to gather information and compile this CRM data since the founding of the company in 2014.

26.     CreatorIQ does not publish or share customer-specific product demonstrations, pricing information, product strategies, or customer lists and contacts with

anyone other than the specific customers receiving a bid—and even then, customers are required to sign confidentiality or non-disclosure agreements prior to any product demonstration. This information is not widely accessible within CreatorIQ except to those employees for whom their job responsibilities require access.

27.     CreatorIQ's product demonstrations, customers, customer contact information, pricing information, and product strategies—individually and in combination with one another—are CreatorIQ's trade secrets.

28.     These trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, competitors — —like Traackr—who offer similar products and services and can obtain economic value by using CreatorIQ's trade secrets to their advantage.

29.     For example, if Traackr knew the customer-specific pricing information that CreatorIQ offers to a particular brand, Traackr could strategically modify its bid to that same brand or customer to either win the business or force CreatorIQ to discount its prices more than it otherwise would. Similarly, if Traackr knew all of the specific functions of CreatorIQ's software user interface and user experience, Traackr could seek to replicate those functions in its own software, or speak directly to those functions in the course of preparing its own bids. Finally, if Traackr knew the details of CreatorIQ's relationship with a particular brand, or lack thereof, Traackr could specifically target that same brand with a bid before CreatorIQ might have an opportunity to do the same.

30.     In order to protect its valuable confidential and proprietary information, CreatorIQ requires, *inter alia*, that key executives given access to such information sign non-disclosure and confidentiality agreements.

31.     To this end, on or about October 1, 2021, and as a condition of his employment with Tribe US "or any of its current or future subsidiaries, affiliates, successors, or assigns"—*i.e.*, CreatorIQ—Staveley signed a Confidential Information and Invention Assignment Agreement (the "Confidentiality Agreement"), which required him to keep all CreatorIQ confidential and proprietary information confidential, and to not retain any CreatorIQ confidential and proprietary information upon the termination of his employment.

32.     More specifically, Paragraph 3 of the Confidentiality Agreement provides:

3. **Confidential Information.**

   a. **Protection of Information.** I understand that during the Relationship, the Company intends to provide me with information, including Confidential Information (as defined below), without which I would not be able to perform my duties to the Company. I agree, at all times during the term of the Relationship and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company to the extent necessary to perform my obligations to the Company under the Relationship, and not to disclose to any person, firm, corporation or other entity, without written authorization from the Company in each instance, any Confidential Information that I obtain, access or create during the term of the Relationship, whether or not during working hours, until such Confidential Information becomes publicly and widely known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved. I further agree not to make copies of such Confidential Information except as authorized by the Company.

   b. **Confidential Information.** I understand that "Confidential Information" means information and physical material not generally known or available outside the Company and information and physical material entrusted to the Company in confidence by third parties. Confidential Information includes, without limitation: (i) Company Inventions (as defined below); and (ii) technical data, trade secrets, know-how, research, product or service ideas or plans, software codes and designs, algorithms, developments, inventions, patent applications, laboratory notebooks, processes,

formulas, techniques, biological materials, mask works, engineering designs and drawings, hardware configuration information, agreements with third parties, lists of, or information relating to, employees and consultants of the Company (including, but not limited to, the names, contact information, jobs, compensation, and expertise of such employees and consultants), lists of, or information relating to, suppliers and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the Relationship), price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical financial data, budgets or other business information disclosed to me by the Company either directly or indirectly, whether in writing, electronically, orally, or by observation.

33. Paragraph 5 of the Confidentiality Agreement, in relevant part, also provides:

I agree that, at the time of termination of the Relationship, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, materials, flow charts, equipment, other documents or property, or reproductions of any of the aforementioned items developed by me pursuant to [my employment] or otherwise belonging to the Company, its successors or assigns.

34. Paragraph 12(f) of the Confidentiality Agreement also provides:

f. **Remedies.** I acknowledge and agree that violation of this Agreement by me may cause the Company irreparable harm, and therefore I agree that the Company will be entitled to seek extraordinary relief in court, including, but not limited to, temporary restraining orders, preliminary injunctions and permanent injunctions without the necessity of posting a bond or other security (or, where such a bond or security is required, I agree that a $1,000 bond will be adequate), in addition to and without prejudice to any other rights or remedies that the Company may have for a breach of this Agreement.

35. The Confidentiality Agreement defined the "Company" as Tribe US "or any of its current or future subsidiaries, successors, or assigns."

36. Similarly, pursuant to Paragraph 12(c) of the Confidentiality Agreement, Staveley agreed that the Confidentiality Agreement was for the benefit of Tribe US's "successors, and its assigns."

## C.  <u>CreatorIQ Takes Reasonable Measures to Protect Its Trade Secrets</u>

37. Because of the critical nature of CreatorIQ's confidential and proprietary information, and how that information allows CreatorIQ to thrive in its industry, CreatorIQ closely guards such information, and takes specific measures to restrict access to and preserve the confidentiality of this information.

38. Employees are generally required to use a badge to enter corporate offices, and visitors must sign in with a receptionist and be escorted to meet with CreatorIQ employees with whom they are meeting.

39. In addition, employees need a username and password to access CreatorIQ's computers. If an employee tries to access any cloud-based applications, multifactor authentication is required. Most applications have user-specific rights, which limit the ability to access certain information or functionalities in an application based on the rights granted to that specific user. When employees send external emails, confidentiality reminders are, by default, inserted at the bottom of the emails.

40. In addition to technology-based measures to protect confidentiality, CreatorIQ also requires that all of its employees abide by policies related to information protection and systems and personal device use, and as a condition of their employment, execute confidentiality agreements which prohibit the disclosure of CreatorIQ's confidential and proprietary information, similar to the Confidentiality Agreement referenced above.

41. Moreover, with respect to prospective customers, prior to providing any product demonstrations, CreatorIQ requires the execution of a non-disclosure agreement prohibiting the disclosure of any information learned as a result of such product demonstrations.

42. Even customers who agree to purchase CreatorIQ's products and services are required, as part of CreatorIQ's master services agreement, to agree not to disclose CreatorIQ's confidential and proprietary information and to certain use restrictions which prohibit, *inter alia*, the reproduction, reverse engineering, and/or sublicensing of CreatorIQ's products and services.

**D.  Staveley Steals CreatorIQ's Trade Secrets and Confidential Information**

43. On or about October 2, 2022, Staveley provided notice to his supervisor that he planned to resign his position with CreatorIQ.

44. Staveley's last day with CreatorIQ was October 14, 2022.

45. Upon information and belief, Staveley immediately thereafter moved to New York City, and began working for Traackr from New York City.

46. Unbeknownst to CreatorIQ, prior to leaving its employ, Staveley retained CreatorIQ's confidential and proprietary information, which he ultimately intended to use for his own, and Traackr's, benefit. Staveley continued to gain unauthorized access to CreatorIQ's confidential and proprietary information even *after* he left CreatorIQ's employ, which he likewise intended to use for his own, and Traackr's, benefit.

**i.  Staveley Improperly Accesses CreatorIQ-owned CRM Database While Employed by Traackr**

47. Hubspot, Inc. ("Hubspot") hosts a customizable electronic subscription software that provides a cloud-based CRM platform.

48. CreatorIQ uses Hubspot as one of its CRM platforms and maintains multiple accounts within Hubspot's software system.

49. Each of CreatorIQ's Hubspot accounts are closed, and inaccessible, to anyone outside of, or not otherwise expressly authorized by, CreatorIQ.

50. Only CreatorIQ's current employees or contractors with authorized login credentials are permitted access to CreatorIQ's Hubspot accounts.

51. As discussed above, CreatorIQ's CRM database – of which Hubspot is a key component – generally contains lists of customers, contract sizes, contract end dates, and customer contacts, including the names, contact information, current employers, and sales notes concerning, in total, more than 30,000 individuals across a multitude of commercial industries from around the world. The contents of CreatorIQ's CRM database is one of its most valuable assets and represents the collective intelligence of scores of CreatorIQ (or legacy company) employees, working for many years to identify, acquire, and catalog this information to provide CreatorIQ with a distinct competitive advantage.

52. While employed by CreatorIQ, Staveley was provided administrator credentials to CreatorIQ's Hubspot account which was associated with his work email address, "ben.staveley@creatoriq.com" ("CreatorIQ Administrator Credentials").

53. In the three months just prior to leaving CreatorIQ, Staveley exported from Hubspot more than 200,000 total records of CreatorIQ's contacts and companies. While there were, perhaps, innocuous justifications for Staveley's conduct given his position with CreatorIQ, the amount of data exported is atypical and, in light of the following, is suggestive of corrupt intent.

54.     More specifically, in or about January 2021, Staveley used his CreatorIQ Administrator Credentials to surreptitiously create a separate, unauthorized login ID connected to a personal email account identified as "ben@seedaconsulting.com" ("Unauthorized Credentials").

55.     Based on publicly available records, SeedA Consulting Ltd. is a now-dissolved UK-based corporate entity which was created in or about January 2021 by Staveley.[1]

56.     On each of the following dates, the Unauthorized Credentials were used to log into and improperly access a CreatorIQ-owned Hubspot account:

- October 16, 2022;
- January 5, 2023;
- January 12, 2023;
- February 2. 2023;
- February 6, 2023;
- February 7, 2023;
- February 19, 2023;
- February 20, 2023;
- March 28, 2023;
- April 29, 2023;
- May 1, 2023; and
- August 9, 2023.

57.     Thus, between October 2022 and August 2023, Staveley used the Unauthorized Credentials to log into and access a CreatorIQ-owned Hubspot account at least twelve (12) times, all of which occurred *after* Staveley left CreatorIQ's employ, including—most recently—the week after this litigation was initiated.

58.     According to the IP addresses associated with each of these twelve log-ins, all but one occurred from internet access points located in New York.

---

[1]     *See* https://seedaconsulting.com/hubspot-consulting/ (last visited Nov. 1, 2023); *see also* https://find-and-update.company-information.service.gov.uk/company/13145598 (last visited Nov. 1, 2023).

59.     CreatorIQ did not authorize or otherwise permit Staveley to use his CreatorIQ Administrator Credentials to create the Unauthorized Credentials, nor did it authorize or otherwise permit Staveley to use the Unauthorized Credentials to log into and/or access any of CreatorIQ's Hubspot accounts, let alone *after* he was no longer employed by CreatorIQ and began working for Traackr.[2]

60.     As a result of Staveley's unauthorized and unpermitted log-ins and access into a CreatorIQ-owned Hubspot account, CreatorIQ hired a forensic expert to further investigate and conduct a damage assessment.

**ii.     Defendants Use CreatorIQ's Trade Secrets and Proprietary Information for Their Commercial Benefit**

61.     In or about May 2023, a current Traackr employee ("Jane Doe"), who works directly with Staveley at Traackr, disclosed to a former CreatorIQ employee ("John Doe"), that Staveley had brought CreatorIQ's confidential and proprietary information with him when he accepted a new role with Traackr and had shared such information with others at Traackr in connection with his work at Traackr.

62.     More specifically, Jane Doe stated emphatically that Staveley "stole" CreatorIQ's confidential and proprietary information, including product demonstrations, customer lists, and contacts, and then furnished this information to other Traackr employees as part of a presentation he provided at a "town hall" meeting.

63.     Upon information and belief, Staveley conducted this "town hall" meeting while in New York City.

---

[2]     CreatorIQ also maintains, and Stavely had credentials to access, additional CRM databases. Additional investigation is needed to determine whether Staveley similarly improperly accessed, or retained information from, those CRM databases before and/or after his departure from CreatorIQ.

64.     Staveley's conduct was so brazen, Jane Doe bluntly described him as "manipulative" and questioned how Traackr could have hired someone with "zero morals."

65.     Jane Doe explained further that no Traackr employees objected to Staveley's retention or disclosure of CreatorIQ's confidential and proprietary information at the town hall meeting and that, quite the opposite, Traackr specifically used the CreatorIQ confidential and proprietary information – including a production demonstration – to ascertain CreatorIQ's perceived weaknesses in the market and to gain competitive intelligence with respect to one of CreatorIQ's customers—one of the leading social media platforms in the world—for potential acquisition.

66.     Traackr's targeted use of CreatorIQ's confidential and proprietary information in this manner exemplifies how valuable CreatorIQ's trade secrets are in the hands of a direct competitor.

### iii. Defendants' Prior and Ongoing Conduct Has Caused CreatorIQ Substantial Damage

67.     As a result of the above-referenced activities, and Traackr and Staveley's ongoing unfair competition and misconduct, CreatorIQ has already been, and is still being, irreparably damaged, with its confidential and proprietary information at significant risk, and its goodwill being damaged.

68.     With Staveley having departed CreatorIQ for a similar role at Traackr, and given his mass downloading of CreatorIQ's CRM data and knowledge and use of CreatorIQ's confidential and proprietary information, CreatorIQ stands to lose millions of dollars in business as well as the value of its goodwill, customer relationships, trade secrets, and confidential and proprietary information.

69.     CreatorIQ's goodwill, customer relationships, trade secrets, and confidential and proprietary information are invaluable, the loss of which would provide an immediate benefit to Traackr, and an equally immediate detriment to CreatorIQ.

70.     Traackr is keenly aware that CreatorIQ is its direct competitor and sensitive to the fact that any competitive advantage it can gain could mean the difference between obtaining and losing customers and, thus, significant amounts of revenue. In fact, a portion of Traackr's corporate website is expressly dedicated to comparing itself to CreatorIQ. A screenshot of this webpage is below:



71.     Based on the information currently in CreatorIQ's possession, Traackr and Staveley have actually misappropriated CreatorIQ's trade secrets and proprietary information, and are actively, and will continue, attempting to sell competing Traackr products and services to CreatorIQ customers and/or prospective customers using that information to Traackr's competitive advantage, in violation of Staveley's Confidentiality Agreement and applicable law.

72.     Traackr and Staveley's actions pose harm to CreatorIQ far beyond just significant monetary losses. Due to the misconduct described herein, Traackr and Staveley will have an unfair advantage in targeting CreatorIQ's customers and/or prospective customers and

developing marketing and sales plans and campaigns based on CreatorIQ's successes, priorities, and weaknesses. Traackr and Staveley will have valuable know-how on how to improve Traackr's services, its customer relationships with current and/or prospective customers of CreatorIQ, and its goodwill.

73.     All told, Traackr and Staveley are causing and threatening, and will continue to cause or threaten, significant irreparable harm to CreatorIQ, including the loss of value of confidential and proprietary information, the loss of long-standing customer relationships, loss of prospective customers, loss of goodwill, and damage to CreatorIQ's reputation as an industry leader and its ability to successfully market its goods and services. Money alone cannot make CreatorIQ whole.

**CAUSES OF ACTION**

**COUNT I**
**VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836,** *et seq.*
**(TRAACKR and STAVELEY)**

74.     CreatorIQ hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 73.

75.     CreatorIQ is the owner of confidential and proprietary information, including, as described above, CreatorIQ's product demonstrations and CRM database information, the latter of which contains 800+ customer names, contract sizes, contract end dates, and 30,000+ customer contacts, including the names, contact information, current employers, and sales notes. This confidential and proprietary information constitutes trade secrets within the meaning of the Defend Trade Secrets Act ("DTSA"), and is used in connection with CreatorIQ's sale and/or attempted sale of its products and services throughout the United States and all over the world.

76. Staveley was in possession of CreatorIQ's trade secrets, including, as described above, CreatorIQ's product demonstrations and information maintained in its CRM database, all of which was subject to the Confidentiality Agreement in which he: (1) expressly acknowledged and confirmed the confidential nature of these trade secrets; (2) agreed to maintain the confidentiality of the trade secrets; and (3) agreed not to use the trade secrets for his own purposes.

77. Staveley nonetheless obtained and/or retained the trade secrets upon his departure from CreatorIQ, and disclosed CreatorIQ's trade secrets to Traackr in violation of his obligations under his Confidentiality Agreement.

78. Traackr accepted the improperly retained and disclosed trade secrets in order to ascertain CreatorIQ's perceived weaknesses in the market, perform competitive analysis on CreatorIQ's software and technology, and to target particular customers for potential acquisition.

79. At the time of such use and disclosure, Traackr knew or had reason to know that its knowledge of the trade secrets was derived from or through persons (*e.g.*, Staveley) who owed a duty to CreatorIQ to maintain the secrecy, and limit the use and disclosure of, the trade secrets.

80. Jane Doe's admissions to John Doe demonstrate that Traackr, in fact, knew that Staveley had improperly retained CreatorIQ's trade secrets, and then improperly disclosed such information to Traackr for its competitive use.

81. CreatorIQ's trade secrets are of substantial economic value and have conferred a competitive advantage on CreatorIQ.

82. Other than through the improper disclosure by Staveley, CreatorIQ's trade secrets are not known to the public and are not readily ascertainable by proper means to persons who could derive value from their disclosure or use.

83. CreatorIQ has taken reasonable steps to maintain the secrecy of its trade secrets, including by, as described above, requiring confidentiality and/or non-disclosure agreements to be signed by any party granted access to CreatorIQ's trade secrets, requiring the use of passwords, and limiting the access afforded by such passwords based on the nature of each employee's role.

84. Staveley misappropriated CreatorIQ's trade secrets through his improper retention, improper disclosure, and improper use of the trade secrets.

85. Traackr misappropriated CreatorIQ's trade secrets by improperly obtaining and improperly using CreatorIQ's trade secrets to its competitive advantage despite having reason to know that CreatorIQ's trade secrets were acquired by improper means.

86. Traackr and Staveley have and will continue to misappropriate CreatorIQ's trade secrets by using these trade secrets, without authority, including by ascertaining CreatorIQ's perceived weaknesses in the market, gaining competitive intelligence with respect to CreatorIQ's customers, and targeting particular customers for potential acquisition.

87. As a result of Traackr and Staveley's misappropriation, CreatorIQ has been and continues to be damaged and irreparably injured, including without limitation, the loss of sales and profits it would have earned but for Traackr and Staveley's actions and damage to CreatorIQ's reputation among potential and existing customers, business partners, investors, and in the industry in general.

88. By virtue of the foregoing conduct, Traackr and Staveley misappropriated CreatorIQ's trade secrets in violation of the DTSA.

89. Traackr and Staveley's current and continued misappropriation of CreatorIQ's trade secrets is willful and malicious. Traackr and Staveley know of the confidentiality, ownership, and use restrictions on the trade secrets, both generally and as a result of Staveley having agreed to such confidentiality, ownership, and use restrictions in signing his Confidentiality Agreement.

90. Traackr and Staveley's misappropriation of CreatorIQ's trade secret information has caused and will continue to cause CreatorIQ irreparable and substantial injury and therefore cannot be fully redressed through damages alone.

91. An injunction prohibiting Traackr and Staveley from further use or disclosure of CreatorIQ's confidential and trade secret information is necessary to provide CreatorIQ with complete relief.

<u>COUNT II</u>
**VIOLATION OF CALIFORNIA UNIFORM TRADE SECRETS ACT,
CALIFORNIA CIVIL CODE § 3426, *et seq.*[3]
(TRAACKR and STAVELEY)**

92. CreatorIQ hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 91.

93. CreatorIQ is the owner of confidential and proprietary information, including, as described above, CreatorIQ's product demonstrations and CRM database

---

[3] CreatorIQ submits that, with the exception of Count V, *infra*, New York law is applicable to its state law claims and causes of action against Traackr and Staveley, respectively. However, in an abundance of caution, and in view of the fact that Traackr and Staveley appear to assert that California law is applicable to some or all of CreatorIQ's state law claims and/or causes of action, CreatorIQ has asserted, in the alternative, certain causes of action under California law (Counts II and VII) and its common law causes of action under both New York and California law (Counts III, IV, VI, VIII, IX, and X).

information, the latter of which contains 800+ customer names, contract sizes, contract end dates, and 30,000+ customer contacts, including the names, contact information, current employers, and sales notes. This confidential and proprietary information constitutes trade secrets within the meaning of California's Uniform Trade Secrets Act ("CUTSA"), California Civil Code § 3426.1(d).

94. Staveley was in possession of CreatorIQ's trade secrets, including, as described above, CreatorIQ's product demonstrations and information maintained in its CRM database, all of which was subject to the Confidentiality Agreement in which he: (1) expressly acknowledged and confirmed the confidential nature of these trade secrets; (2) agreed to maintain the confidentiality of the trade secrets; and (3) agreed not to use the trade secrets for his own purposes.

95. Staveley nonetheless obtained and/or retained the trade secrets upon his departure from CreatorIQ, and disclosed CreatorIQ's trade secrets to Traackr in violation of his obligations under his Confidentiality Agreement.

96. Traackr accepted the improperly retained and disclosed trade secrets in order to ascertain CreatorIQ's perceived weaknesses in the market, perform competitive analysis on CreatorIQ's software and technology, and to target particular customers for potential acquisition.

97. At the time of such use and disclosure, Traackr knew or had reason to know that its knowledge of the trade secrets was derived from or through persons (*e.g.*, Staveley) who owed a duty to CreatorIQ to maintain the secrecy, and limit the use and disclosure of, the trade secrets.

98. Jane Doe's admissions to John Doe demonstrate that Traackr, in fact, knew that Staveley had improperly retained CreatorIQ's trade secrets, and then improperly disclosed such information to Traackr for its competitive use.

99. CreatorIQ's trade secrets are of substantial economic value and have conferred a competitive advantage on CreatorIQ.

100. Other than through the improper disclosure by Staveley, CreatorIQ's trade secrets are not known to the public and are not readily ascertainable by proper means to persons who could derive value from their disclosure or use.

101. CreatorIQ has taken reasonable steps to maintain the secrecy of its trade secrets, including by, as described above, requiring confidentiality and/or non-disclosure agreements to be signed by any party granted access to CreatorIQ's trade secrets, requiring the use of passwords, and limiting the access afforded by such passwords based on the nature of each employee's role.

102. Staveley misappropriated CreatorIQ's trade secrets through his improper acquisition, improper retainment, improper disclosure, and improper use of the trade secrets.

103. Traackr misappropriated CreatorIQ's trade secrets by improperly obtaining and improperly using CreatorIQ's trade secrets to its competitive advantage despite having reason to know that CreatorIQ's trade secrets were acquired by improper means.

104. Traackr and Staveley have and will continue to misappropriate CreatorIQ's trade secrets by using these trade secrets, without authority, including by ascertaining CreatorIQ's perceived weaknesses in the market, gaining competitive intelligence with respect to CreatorIQ's customers, and targeting particular customers for potential acquisition.

105.     As a result of Traackr and Staveley's misappropriation, CreatorIQ has been and continues to be damaged and irreparably injured, including without limitation, the loss of sales and profits it would have earned but for Traackr and Staveley's actions and damage to CreatorIQ's reputation among potential and existing customers, business partners, investors, and in the industry in general.

106.     By virtue of the foregoing conduct, Traackr and Staveley misappropriated CreatorIQ's trade secrets in violation of the CUTSA.

107.     Traackr and Staveley's current and continued misappropriation of CreatorIQ's trade secrets is willful and malicious. Traackr and Staveley know of the confidentiality, ownership, and use restrictions on the trade secrets, both generally and as a result of Staveley having agreed to such confidentiality, ownership, and use restrictions in signing his Confidentiality Agreement.

108.     Traackr and Staveley's misappropriation of CreatorIQ's trade secret information has caused and will continue to cause CreatorIQ irreparable and substantial injury and therefore cannot be fully redressed through damages alone.

109.     An injunction prohibiting Traackr and Staveley from further use or disclosure of CreatorIQ's confidential and trade secret information is necessary to provide CreatorIQ with complete relief.

<u>**COUNT III**</u>
**COMMON LAW MISAPPROPRIATION OF TRADE SECRETS**
**(TRAACKR and STAVELEY)**
**(Pursuant to New York and California Law)**

110.     CreatorIQ hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 109.

111.    CreatorIQ is the owner of confidential and proprietary information, including, as described above, CreatorIQ's product demonstrations and CRM database information, the latter of which contains 800+ customer names, contract sizes, contract end dates, and 30,000+ customer contacts, including the names, contact information, current employers, and sales notes. This confidential and proprietary information constitutes trade secrets under common law.

112.    Staveley was in possession of CreatorIQ's trade secrets, including, as described above, CreatorIQ's product demonstrations and information maintained in its CRM database, all of which was subject to the Confidentiality Agreement in which he: (1) expressly acknowledged and confirmed the confidential nature of these trade secrets; (2) agreed to maintain the confidentiality of the trade secrets; and (3) agreed not to use the trade secrets for his own purposes.

113.    Staveley nonetheless obtained and/or retained the trade secrets upon his departure from CreatorIQ, and disclosed CreatorIQ's trade secrets to Traackr in violation of his obligations under his Confidentiality Agreement.

114.    Traackr accepted the improperly retained and disclosed trade secrets in order to ascertain CreatorIQ's perceived weaknesses in the market, perform competitive analysis on CreatorIQ's software and technology, and to target particular customers for potential acquisition.

115.    At the time of such use and disclosure, Traackr knew or had reason to know that its knowledge of the trade secrets was derived from or through persons (*e.g.*, Staveley) who owed a duty to CreatorIQ to maintain the secrecy, and limit the use and disclosure of, the trade secrets.

116. Jane Doe's admissions to John Doe demonstrate that Traackr, in fact, knew that Staveley had improperly retained CreatorIQ's trade secrets, and then improperly disclosed such information to Traackr for its competitive use.

117. CreatorIQ's trade secrets are of substantial economic value and have conferred a competitive advantage on CreatorIQ.

118. Other than through the improper disclosure by Staveley, CreatorIQ's trade secrets are not known to the public and are not readily ascertainable by proper means to persons who could derive value from their disclosure or use.

119. CreatorIQ has taken reasonable steps to maintain the secrecy of its trade secrets, including by, as described above, requiring confidentiality and/or non-disclosure agreements to be signed by any party granted access to CreatorIQ's trade secrets, requiring the use of passwords, and limiting the access afforded by such passwords based on the nature of each employee's role.

120. Staveley misappropriated CreatorIQ's trade secrets through his improper acquisition, improper retainment, improper disclosure, and improper use of the trade secrets.

121. Traackr misappropriated CreatorIQ's trade secrets by improperly obtaining and improperly using CreatorIQ's trade secrets to its competitive advantage despite having reason to know that CreatorIQ's trade secrets were acquired by improper means.

122. Traackr and Staveley have and will continue to misappropriate CreatorIQ's trade secrets by using these trade secrets, without authority, including by ascertaining CreatorIQ's perceived weaknesses in the market, gaining competitive intelligence with respect to CreatorIQ's customers, and targeting particular customers for potential acquisition.

123.     As a result of Traackr and Staveley's misappropriation, CreatorIQ has been and continues to be damaged and irreparably injured, including without limitation, the loss of sales and profits it would have earned but for Traackr and Staveley's actions and damage to CreatorIQ's reputation among potential and existing customers, business partners, investors, and in the industry in general.

124.     By virtue of the foregoing conduct, Traackr and Staveley misappropriated CreatorIQ's trade secrets.

125.     Traackr and Staveley's current and continued misappropriation of CreatorIQ's trade secrets is willful and malicious. Traackr and Staveley know of the confidentiality, ownership, and use restrictions on the trade secrets, both generally and as a result of Staveley's having agreed to such confidentiality, ownership, and use restrictions in signing his Confidentiality Agreement.

126.     Traackr and Staveley's misappropriation of CreatorIQ's trade secret information has caused and will continue to cause CreatorIQ irreparable and substantial injury and therefore cannot be fully redressed through damages alone.

127.     An injunction prohibiting Traackr and Staveley from further use or disclosure of CreatorIQ's confidential and trade secret information is necessary to provide CreatorIQ with complete relief.

**COUNT IV**
**BREACH OF FIDUCIARY DUTY**
**(STAVELEY)**
**(Pursuant to New York and California Law)**

128.     CreatorIQ hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 127.

129.     As an individual in an employment relationship with CreatorIQ, and as an individual who was entrusted with confidential and proprietary information, Staveley had a fiduciary relationship with CreatorIQ and owed CreatorIQ a fiduciary duty. Staveley was under an obligation not to usurp or misappropriate company opportunities for his personal gain.

130.     Staveley breached his fiduciary duty to CreatorIQ by usurping opportunities and using or misappropriating CreatorIQ's confidential and proprietary information during his employment at CreatorIQ by having retained such information after leaving CreatorIQ's employ, despite an obligation to return such information, for the purpose of using such information to compete against CreatorIQ on behalf of Traackr.

131.     Staveley, thereafter, in fact used CreatorIQ's confidential and proprietary information in connection with his employment at Traackr for his own, personal benefit.

132.     As a direct and proximate result of Staveley's actions, CreatorIQ has been and will continue to be damaged in an amount to be determined at trial.

<u>**COUNT V**</u>
**BREACH OF CONTRACT—CONFIDENTIALITY AGREEMENT**
**(STAVELEY)**

133.     CreatorIQ hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 132.

134.     CreatorIQ and Staveley entered into a valid and enforceable contract in the form of the Confidentiality Agreement.

135.     In the Confidentiality Agreement, Staveley agreed in Paragraph 3(a) that he would "hold in strictest confidence, and not to use, except for the benefit of [CreatorIQ] to the extent necessary to perform [his] obligations to [CreatorIQ] under [his employment], and not to disclose to any person, firm, corporation or other entity, without written authorization from

[CreatorIQ] in each instance, any Confidential Information that [he] obtain[s], access[es] or create[s] during the term of [his employment]."

136.     In the Confidentiality Agreement, Staveley also agreed in Paragraph 3(b), that "Confidential Information" meant "information and physical material not generally known or available outside [CreatorIQ] and information and physical material entrusted to [CreatorIQ] in confidence by third parties" including, but not limited to, "technical data, trade secrets, know-how, research, product or service ideas or plans, software codes and designs, algorithms, developments, inventions, patent applications, laboratory notebooks, processes, formulas, techniques, biological materials, mask works, engineering designs and drawings, hardware configuration information, agreements with third parties, lists of, or information relating to, employees and consultants of [CreatorIQ] (including, but not limited to, the names, contact information, jobs, compensation, and expertise of such employees and consultants), lists of, or information relating to, suppliers and customers (including, but not limited to, customers of [CreatorIQ] on whom [he] called or with whom [he] became acquainted during [his employment]), price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical financial data, budgets or other business information disclosed to [him] by [CreatorIQ] either directly or indirectly, whether in writing, electronically, orally, or by observation."

137.     In the Confidentiality Agreement, Staveley also agreed in Paragraph 5, that "at the time of termination" of his employment with CreatorIQ, he would "deliver to [CreatorIQ] (and will not keep in [his] possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, materials, flow charts, equipment, other documents or

property, or reproductions of any of the aforementioned items developed by [him] pursuant to [his employment] or otherwise belonging to [CreatorIQ], its successors or assigns."

138.     Staveley materially breached the foregoing provisions of the Confidentiality Agreement by, among other things, retaining CreatorIQ's confidential information—including, at a minimum, CreatorIQ's product demonstrations, customer lists, and contacts—upon termination of his employment, disclosing such confidential information to Traackr, and using such confidential information for his own benefit and for the benefit of Traackr, all without CreatorIQ's consent (written or otherwise), as described above.

139.     CreatorIQ has complied with all of its material obligations under the Confidentiality Agreement.

140.     Staveley's breaches have directly, substantially, and irreparably harmed CreatorIQ.

141.     Further, Staveley agreed in Paragraph 12(f) of the Confidentiality Agreement that his violation of the Confidentiality Agreement "may cause [CreatorIQ] irreparable harm," and therefore "agree[d] that [CreatorIQ] will be entitled to seek extraordinary relief in court, including, but not limited to, temporary restraining orders, preliminary injunctions and permanent injunctions."

142.     Staveley's use and continued possession of confidential CreatorIQ information has caused and will continue to cause CreatorIQ irreparable and substantial injury and therefore cannot be fully redressed through damages alone.

143.     An injunction prohibiting Staveley from further use or disclosure of CreatorIQ's confidential and trade secret information is necessary to provide CreatorIQ with complete relief.

**COUNT VI**
**TORTIOUS INTERFERENCE WITH CONTRACT**
**(TRAACKR)**
**(Pursuant to New York and California Law)**

144.     CreatorIQ hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 143.

145.     CreatorIQ had an existing contract—Staveley's Confidentiality Agreement—of which Traackr had knowledge, either directly or indirectly, because individuals in the influencer marketing industry with employment positions similar to that which Staveley held with CreatorIQ routinely execute comparable confidentiality agreements.

146.     Traackr knew that Staveley's Confidentiality Agreement prohibited him from retaining and/or disclosing to third parties CreatorIQ's confidential information following the termination of his employment relationship with CreatorIQ.

147.     Nonetheless, Traackr intentionally interfered with Staveley's Confidentiality Agreement by permitting Staveley to misappropriate and disclose CreatorIQ's confidential information to Traackr and allowing Traackr's employees to misappropriate and use such information to, at a minimum, ascertain CreatorIQ's perceived weaknesses in the market and target particular customers for potential acquisition.

148.     Traackr's interference injured CreatorIQ by depriving it of the value of its bargained-for contractual agreement with Staveley.

149.     As a direct and proximate result of Traackr's actions, CreatorIQ has been and will continue to be damaged in an amount to be determined at trial.

## COUNT VII
## VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE
## FOR UNFAIR BUSINESS PRACTICES, §17200, *et seq.*
## (TRAACKR AND STAVELEY)

150.     CreatorIQ hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 149.

151.     Traackr and Staveley have engaged in unfair and unlawful business practices against CreatorIQ in violation of California Business and Professions Code Section §17200, *et seq.*, by taking the actions complained of above, including but not limited to: acquiring an unfair competitive advantage by, *inter alia*, improperly retaining, disclosing, obtaining, and/or receiving confidential and proprietary information— including CreatorIQ's product demonstrations, customer lists, and contacts—which CreatorIQ possessed solely by reason of its labor, skill, and expenditures, without CreatorIQ's authorization or consent; secretly retaining, disclosing, obtaining and/or receiving such confidential and proprietary information to engage in direct competition with CreatorIQ; compromising the confidentiality of CreatorIQ's confidential and proprietary information; compromising CreatorIQ's ability to compete; and usurping CreatorIQ's business and customers.

152.     As a direct and proximate result of Traackr and Staveley's unfair competition in violation of Business and Professions Code Section §17200, *et seq.*, Traackr and Staveley have been unjustly enriched in an amount not yet ascertained.

153.     As a direct and proximate result of Traackr and Staveley's unfair competition in violation of Business and Professions Code Section §17200, *et seq.*, CreatorIQ has suffered and will continue to suffer harm.

154. CreatorIQ is entitled to such relief as may be necessary to restore to it all lost profits and other monies owed and belonging to it, including the disgorgement of all money unjustly received as a result of the wrongful acts.

155. Traackr and Staveley's violations of Business and Professions Code Section §17200, *et seq.*, have caused and will continue to cause CreatorIQ irreparable and substantial injury and therefore cannot be fully redressed through damages alone.

156. An injunction prohibiting Traackr and Staveley from further use or disclosure of CreatorIQ's confidential and trade secret information is necessary to provide CreatorIQ with complete relief.

## COUNT VIII
## UNFAIR COMPETITION
## (TRAACKR AND STAVELEY)
## (Pursuant to New York and California Law)

157. CreatorIQ hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 156.

158. Traackr and Staveley knowingly, wrongfully, and in bad faith misappropriated and exploited CreatorIQ's commercial advantages, including by improperly retaining, disclosing, obtaining, and/or receiving confidential and proprietary information—including CreatorIQ's product demonstrations, customer lists, and contacts—which CreatorIQ possessed solely by reason of its labor, skill, and expenditures, without CreatorIQ's authorization or consent; secretly retaining, disclosing, obtaining and/or receiving such confidential and proprietary information to engage in direct competition with CreatorIQ; compromising the confidentiality of CreatorIQ's confidential and proprietary information; compromising CreatorIQ's ability to compete; and usurping CreatorIQ's business and customers.

159. Traackr and Staveley's knowing, wrongful, and bad faith misappropriation and exploitation of CreatorIQ's commercial advantages, without any corresponding benefit to CreatorIQ, constituted unfair competition.

160. This unfair competition was effected in part through the manipulation of CreatorIQ from within so that Traackr could profit at CreatorIQ's expense.

161. As a direct and proximate result of these actions, CreatorIQ has been and will continue to be damaged in an amount to be determined at trial.

**COUNT IX**
**UNJUST ENRICHMENT**
**(TRAACKR AND STAVELEY)**
**(Pursuant to New York and California Law)**

162. CreatorIQ hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 161.

163. Traackr and Staveley have been unjustly enriched and benefitted as a result of Staveley's wrongful taking of CreatorIQ's confidential and proprietary information, and Traackr and Staveley's wrongful use of such information, as described above.

164. While employed by CreatorIQ, and at CreatorIQ's expense, Staveley received the benefit of learning CreatorIQ's products, business strategies, customer identities and contacts, its approach to customer bids, and its customer-specific pricing information, among other things.

165. In his new position at Traackr, Staveley has an undue advantage against CreatorIQ.

166. For example, Staveley has CreatorIQ's confidential and competitively sensitive information that has allowed Traackr and Staveley to gain an undue and unfair advantage over CreatorIQ in a highly specialized and competitive market.

167.     Jane Doe's admissions to John Doe demonstrate that Traackr, in fact, affirmatively used CreatorIQ's confidential and competitively sensitive information that Staveley improperly retained and then improperly disclosed to Traackr, for its competitive use and benefit.

168.     Staveley is being compensated by Traackr, at least in part, for the knowledge Staveley gained under CreatorIQ's employ, and, upon information and belief, the CreatorIQ confidential information Staveley stole for the purpose of using at Traackr.

169.     Accordingly, Staveley's compensation from Traackr, which stems, at least in part, from the unlawful and improper conduct alleged herein, has unjustly enriched and will continue to enrich Staveley to the detriment and harm of CreatorIQ.

170.     Accordingly, as a matter of equity, Staveley should be required to disgorge any and all income and bonuses resulting from the improper and unlawful conduct alleged herein and to reimburse CreatorIQ in an amount equal to Staveley's unjust enrichment.

171.     Further, Traackr has been and will continue to be unjustly enriched by receiving and using CreatorIQ's confidential and proprietary information as alleged herein, to the detriment of CreatorIQ.

172.     Accordingly, as a matter of equity, Traackr should be required to disgorge any and all revenue and profits received from obtaining any and all new customers wherein CreatorIQ's confidential information was used to provide Traackr an unfair advantage in the acquisition process.

**COUNT X**
**CONVERSION**
**(TRAACKR AND STAVELEY)**
**(Pursuant to New York and California Law)**

173.     CreatorIQ hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 172.

174.     CreatorIQ is the exclusive owner of its trade secrets, confidential and proprietary information, as well as any documents and/or computer/digital files containing such information.

175.     Traackr and Staveley wrongfully retained and/or obtained possession of and converted to their own use CreatorIQ's documents and/or computer/digital files containing CreatorIQ's trade secrets, confidential and proprietary information as described above.

176.     Traackr and Staveley had no right or title, and continue to have no right or title, to any of CreatorIQ's documents and/or computer/digital files.

177.     As a direct and proximate result of these actions, CreatorIQ has been and will continue to be damaged in an amount to be determined at trial.

**COUNT XI**
**COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030, *et seq.***
**(STAVELEY)**

178.     CreatorIQ hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 177.

179.     Between October 2022 and August 2023, Staveley intentionally, without authorization or permission, and with intent to steal trade secret, proprietary, and/or confidential information from CreatorIQ, used the Unauthorized Credentials to gain access to protected computers and databases, particularly a CreatorIQ-owned Hubspot account.

180.    As a result of that access, Staveley unlawfully viewed and obtained CreatorIQ's trade secret, proprietary, and/or confidential information.

181.    The protected computers and databases involve interstate communication, and are regularly used to conduct CreatorIQ's business and communicate through the internet with individuals and entities, including those throughout the United States.

182.    Staveley's conduct constitutes a violation of the Computer Fraud and Abuse Act ("CFAA"), including, at a minimum, 18 U.S.C. §§ 1030(a)(2)(C) and (a)(4).

183.    As a result of Staveley's violation of the CFAA, CreatorIQ suffered a "loss" as defined in 18 U.S.C. §§ 1030(c)(4)(A)(i)(I) and (e)(11), because CreatorIQ was forced to retain a forensic expert to conduct a damage assessment and further investigate the scope and extent of the unauthorized access and determine the harm inflicted.

184.    The cost of that investigation exceeded $5,000.

185.    By reason of the foregoing, CreatorIQ is entitled to damages and an injunction under 18 U.S.C. § 1030(g).

## ATTORNEYS' FEES

186.    CreatorIQ hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 185.

187.    Staveley's actions, in improperly retaining CreatorIQ's trade secrets following the termination of his employment with CreatorIQ in violation of the Confidentiality Agreement, and the disclosure of CreatorIQ's trade secrets to Traackr for the purpose of using, and the actual use of, such information to compete against CreatorIQ on behalf of Traackr, as described above, amounted to the willful and malicious misappropriation of CreatorIQ's trade secrets.

188. Traackr's actions, in knowingly accepting CreatorIQ's trade secrets from Staveley, which it knew to have been improperly retained, and Traackr's actual use of such information to compete against CreatorIQ, as described above, amounted to the willful and malicious misappropriation of CreatorIQ's trade secrets.

189. CreatorIQ has been forced to retain the undersigned attorneys in connection with this matter. CreatorIQ has agreed to pay the undersigned attorneys a reasonable fee for their services.

190. Therefore, CreatorIQ respectfully requests that this Court award CreatorIQ its reasonable attorneys' fees and other costs pursuant to 18 U.S.C. § 1836(b)(3)(D) of the DTSA and Cal. Civ. Code. § 3426.4 of the CUTSA.

## TREBLE, EXEMPLARY, AND PUNITIVE DAMAGES

191. CreatorIQ hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 190.

192. Traackr and Staveley's conduct, as described above, was aggravated by the kind of willfulness and malice for which the law allows the imposition of treble, exemplary, and/or punitive damages. Moreover, Traackr and Staveley's conduct was committed knowingly and with conscious indifference to CreatorIQ's property rights. Therefore, CreatorIQ is entitled to recover treble, exemplary, and/or punitive damages from Traackr and Staveley, jointly and severally, pursuant to 18 U.S.C. § 1836(b)(3)(C) of the DTSA and/or Cal. Civ. Code. § 3426.3(c) of the CUTSA.

WHEREFORE, CreatorIQ demands judgment in its favor on all counts and against Staveley and Traackr, jointly and severally, and for an Order for:

A. A preliminary and permanent injunction against Defendants, enjoining Defendants from: (i) obtaining, accessing, using, possessing, retaining, transmitting, copying, or disclosing any CreatorIQ confidential, proprietary, or trade secret information; (ii) deleting,

destroying, altering, or erasing any evidence related to this action, including but not limited to any hard or electronic copies of any CreatorIQ confidential, proprietary, or trade secret information Staveley copied, accessed, or took from CreatorIQ, and any computers or data storage devices used to access or retain such information; and (iii) accessing any CreatorIQ-owned Hubspot account using login credentials created and/or used by Staveley while employed by CreatorIQ or by any other means;

B. Directing the return to CreatorIQ all information, documents, and tangible things in Staveley's or Traackr's possession, custody, or control, whether in physical or digital format, including any and all copies thereof, that contain CreatorIQ's confidential, proprietary, or trade secret information, including specifically the product demonstrations, customer names, and contacts, identified by Jane Doe and any other information provided to Traackr's employees during the "town hall" meeting described herein;

C. Directing Traackr and Staveley to provide access to an independent third-party vendor all data storage devices, data storage accounts, email, local drives, shared drives, phones, tablets, CRMs, or other computer systems to which Staveley used or had access to or to which Traackr used to access, store, or share CreatorIQ's confidential, proprietary, or trade secret information, so that the vendor may catalog any such information or otherwise preserve evidence for this litigation and remove any such CreatorIQ confidential information from Staveley and Traackr's possession;

D. Directing Traackr and Staveley, after the third-party vendor's investigation and work is complete pursuant to the above, to provide a certification to CreatorIQ under penalty of perjury that they have returned and are not in possession – in electronic or hard copy form – of any CreatorIQ confidential, proprietary, or trade secret information, including confirmation that they have reviewed all business and personal email accounts, cloud-based data storage accounts, phones, tablets, computers, data storage devices, back- up drives, hard copy files, and any other location that they believe could contain confidential, proprietary, or trade secret information;

E. Directing Traackr and Staveley to identify any person or entity to whom Traackr and/or Staveley disclosed or provided any copy of all or any part of CreatorIQ's confidential, proprietary, or trade secret information, or for whom Traackr used such information in a sales presentation, marketing materials or pricing proposal, and to put them on notice not to use and to return to CreatorIQ any such information so provided;

F. An accounting of monies obtained through Traackr and Staveley's wrongful acts;

G. Compensatory damages in an amount to be determined at trial;

H. Disgorgement of all sums improperly obtained;

I. Exemplary damages of twice the amount awarded as general damages for Count I and II for misappropriation of trade secrets pursuant to the DTSA and CUTSA;

J. Punitive damages in an amount to be determined at trial;

K. Pre- and post-judgment interest;

L. Cost and disbursements (including those costs incurred in the forensic imaging and investigation of any computer system) incurred in this action, including reasonable attorneys' fees pursuant to the DTSA and CUTSA; and

M. For any other and further relief as provided for by contract, statute, or law, or that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

CreatorIQ demands trial by jury on all claims and issues so triable.


Dated: November 7, 2023     SLARSKEY LLC
   New York, New York

By: _____
Renee Bea
Richard Weingarten
767 Third Avenue, 14th Floor
New York, New York 10017
(212) 658-0661
*Counsel for Plaintiff*
*Socialedge, Inc. d/b/a CreatorIQ*